LOUIS PINTSOPOLOUS & another *vs.* HOME INSURANCE
COMPANY & another.

Suffolk.    April 5, 1960. — April 28, 1960.

Present: WILKINS, C.J., SPALDING, COUNIHAN, WHITTEMORE, &
CUTTER, JJ.

*Vandalism.    Insurance,* Against vandalism.    *Evidence,* Opinion: expert.

In an action for damage to a bulldozer tractor of the plaintiff insured by
the defendant against vandalism, a finding that the damage resulted
from vandalism was warranted by evidence that the tractor motor
suddenly broke down one day after having worked "all right" for
twelve days following purchase of the tractor by the plaintiff, and that
an expert mechanic, who had "rebuilt the motor" shortly before the

purchase, took down the motor promptly after the breakdown, found "an accumulation of sand and grit," and "thought he drained . . . roughly . . . a quart of sand" from it which had "just ruined" it, together with opinion testimony by the mechanic that "sand can't get in . . . unless somebody puts it in."

CONTRACT. Writ in the Superior Court dated February 10, 1954.

The action was tried before *Goldberg,* J.

*Daniel A. Canning,* for the defendant Home Insurance Company.

*Israel Bernstein,* for the plaintiffs.

CUTTER, J. This is an action to recover for injury to a bulldozer tractor, alleged to have been insured by the insurance company against loss or damage from malicious mischief, destruction, and vandalism. The insurance company's sole exception is to the denial of its motion for a directed verdict.

The evidence, in its aspect most favorable to the plaintiffs, shows that the tractor was purchased at an auction on June 13, 1953, and was immediately covered by insurance for malicious destruction and vandalism "because there was . . . animosity at the auction." From June 13 to June 25, the tractor was used on different jobs and was in Winthrop "day and night . . . up to June 25." The machine was "tested the day before they bought it . . . [and] sounded good and ran good." It "worked all right between the 13th and the 25th" for "approximately 48 or 54 hours." On the morning of June 25, 1953, after about two to three hours of work, the oil pressure dropped. The oil lines, fuel lines, fuel and oil filters, and oil pump then were checked and were found in good condition. An expert "who had rebuilt this engine in May, 1953," took "the engine down" and "found . . . an accumulation of sand and grit." The expert "thought he drained . . . roughly . . . a quart of sand from the motor" of which the insurance representative took a sample "probably about a half pint of sand." The sand was "very fine beach sand like a grinding compound." It "just ruined the bearing pistons and rings and every-

thing general in that machine." The machine was "losing oil pressure" because "grit was going through the bearings with the oil and . . . you lost your clearance and your bearings and there was nothing there to hold the oil in." Oil "is placed in the machine through a filling cap" and "sand can't get in . . . unless somebody puts it in . . . . The cap is always on the motor and it doesn't matter under what conditions the machine . . . [may have been] working . . . you could not get that much sand in the motor." The sand "is not sucked up through the air intake because the filters won't allow it to get in there."

The plaintiffs had the burden of proof of showing that the loss was caused by vandalism, that is, by "such wanton and malicious acts as are intended to damage or destroy the property insured." See *Rich* v. *United Mut. Fire Ins. Co.* 328 Mass. 133, 134–135. Unlike the *Rich* case, the evidence already summarized warranted the jury in concluding that there was greater probability that the quart of sand reached the motor through the oil intake because of intentional human intervention constituting malicious mischief or vandalism than that it came there by any accidental or negligent means or through normal use. The jury could reasonably reach this conclusion from the expert's testimony and the circumstance that the machine suddenly stopped working well on June 25. There was no need for the jury to rely on the statements, apparently in evidence subject to no exception, (a) of an agent of the insurance company, which if authorized might be admissions, or (b) of the expert that there had been vandalism in this situation. The expert's opinion about the possibility of sand reaching the motor, except in one way, was not mere speculation or a guess from subordinate facts, as in *Sevigny's Case*, 337 Mass. 747, 751, on a matter about which nobody, in the state of existing scientific progress, could have knowledge, nor were the basic facts gratuitously assumed. See *Brown* v. *United States Fid. & Guar. Co.* 336 Mass. 609, 613–614. It was the opinion of "a mechanic on all types of work and . . . on bulldozers of the same type and kind

. . . since 1929" who had "rebuilt the motor" before the breakdown and who promptly investigated the cause of the loss of oil pressure when it occurred. His opinion related to mechanical facts susceptible of actual knowledge. Various considerations, advanced to show that the expert's views were in some respects not persuasive, went only to the weight of his testimony. It was for the jury to determine what weight was to be given to them. A verdict for the insurance company could not have been directed.

*Exceptions overruled.*